Daniel P. WICHMANN, Relator,

v.

**TRAVALIA & U.S. DIRECTIVES, INC., Respondent,**

**Department of Employment and Economic Development, Respondent.**

No. A06–677.

Court of Appeals of Minnesota.

April 3, 2007.

---

Lisa Hollingsworth, Southern Minnesota Regional Legal Services, Prior Lake, MN, for relator.

Travalia & U.S. Directives, Inc., Prior Lake, MN, for respondent.

Lee B. Nelson, Linda A. Holmes, Minnesota Department of Employment and Economic Development, St. Paul, MN, for respondent.

Considered and decided by HALBROOKS, Presiding Judge; ROSS, Judge; and CRIPPEN, Judge.[*]

## OPINION

ROSS, Judge.

Daniel Wichmann challenges an unemployment law judge's (ULJ) decision that he was discharged for employment misconduct and is disqualified from receiving unemployment benefits. Wichmann argues that the ULJ failed to conduct a fair evidentiary hearing, applied the wrong notice standard when evaluating illness-related absences, and failed to make statutorily required findings on credibility. We find no support for Wichmann's assertions that the hearing was unfair or that the ULJ applied the wrong notice standard. Because the ULJ did not make any findings addressing the credibility of the witnesses and the ULJ's decision relied on his credibility assessments, however, we remand to the ULJ to make the additional findings addressing credibility as required by Minnesota Statutes section 268.105, subdivision 1(c) (Supp.2005).

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

Daniel Wichmann was employed as a full-time stable manager by the Minnesota Horse & Hunt Club, which is owned by Travalia & U.S. Directives, Inc., from May 2003 until November 23, 2005. Wichmann worked for the division of the club that boards and trains privately owned horses. The club discharged Wichmann for being absent from or late to work without notice, falsifying his timecard, and engaging in inappropriate conduct.

Kathy Urseth, an owner of the club and the club's stable-operations manager, testified that horses must remain on a regular schedule. Wichmann's morning duties included feeding the horses, giving them water, and turning them out. These tasks were usually to be completed by 7:30 a.m. Urseth testified that the horses should be stabled by 4:00 or 5:00 p.m. in November. She explained that tending to them early in the morning is particularly important to avoid prolonged food and water deprivation.

Urseth testified that a "downward spiral" in Wichmann's conduct during November 2005 led the club to discharge him. On November 7, at about 8:00 a.m., Urseth noticed that Wichmann had not yet tended to the horses. She testified that he had not told her he would be absent or late. Wichmann resided in a trailer on the club's premises, but he was not at his home, and Urseth was unable to contact him by telephone. Urseth arranged for another employee to arrive earlier than scheduled to perform Wichmann's duties. This employee reported that Wichmann finally arrived between noon and 1:00 p.m. The employee later discovered that Wichmann altered his timecard by writing on it that he had arrived at 5:00 a.m. He left at 3:00 p.m.,

therefore claiming that he worked ten hours on November 7. Wichmann disputed Urseth's allegations. He testified that he could prove he was at work in the morning because his telephone bill reflects that he made a 6:13 a.m. call to his girlfriend that day and he remembers speaking to her while working.

On November 16, Urseth checked the barn at about 8:00 a.m. and discovered that Wichmann had not fed the horses. She knocked on the door of his trailer for about five minutes before he answered. Wichmann assured her that he would complete his chores and he would not be late again. Urseth left Wichmann at about 8:15 a.m., but Wichmann wrote on his timecard that he began working at 8:00 a.m. that day. On November 18, Urseth discovered at 8:15 a.m. that the horses were still locked in their stalls and had not been fed. She pounded on the door of Wichmann's trailer, and he answered ten minutes later. Wichmann apologized and said it would not happen again. Wichmann acknowledged that he was late these two days.

On the morning of November 21, Wichmann completed his morning chores, but he then went home without telling anyone. The next day, Wichmann did not arrive at work. Urseth went to his trailer, and when Wichmann opened the door, Urseth observed that he "looked terrible." Wichmann told her he was not feeling well. Urseth asked him if he would be able to feed the horses while she tried to find an employee to fill in for him for the rest of the day. Wichmann agreed to feed the horses. Urseth checked on Wichmann that evening. He told her that he would feed the horses the following morning. Urseth had arranged for another employee to arrive at 8:30 a.m. to take over for Wichmann. At 8:00 a.m. on November 23, Urseth discovered that Wichmann had completed no work and she again went to his trailer. Urseth asserts that Wichmann was upset that she awakened him and he told her, "I'm supposed to be on vacation." Urseth testified that Wichmann's vacation was not scheduled to begin until the following day, November 24. Wichmann worked for about thirty minutes on November 23 and left three unpleasant voice messages for Urseth within three minutes, including one stating, "So I'm just your puppet now? You put me where you want me? That s—t isn't going to fly, Miss Kathy!" Urseth and the club's general manager discharged Wichmann later in the day. Wichmann testified that Urseth knew he was ill November 21 through November 23 and that he had given her notice that he would be absent.

Wichmann applied for unemployment benefits, but the Department of Employment and Economic Development found that he was disqualified because he had been discharged for employment misconduct. Following an evidentiary hearing, a ULJ reached the same conclusion. The ULJ affirmed his decision after Wichmann filed a request for reconsideration. By writ of certiorari, Wichmann challenges the ULJ's decision, asserting that the ULJ failed to properly assist him and to conduct a fair hearing, applied the wrong notice standard when considering Wichmann's illness-related absences, and failed to make statutorily required credibility findings.

### ISSUES

I. Did the unemployment law judge conduct a fair hearing?

II. Did the unemployment law judge apply the wrong standard when evaluating illness-related absences?

III. Is an unemployment law judge required to make findings that address the credibility of testifying

witnesses when credibility determinations affect the outcome of a proceeding?

## ANALYSIS

■■■ When an employer discharges an employee for employment misconduct, the employee is disqualified from unemployment benefits. Minn.Stat. § 268.095, subd. 4(1) (Supp.2005). "Employment misconduct" is intentional, negligent, or indifferent conduct that displays clearly either "a serious violation of the standards of behavior the employer has the right to reasonably expect" or "a substantial lack of concern for the employment." *Id.,* subd. 6(a) (2004). Whether an employee engaged in employment misconduct presents a mixed question of law and fact. *Schmidgall v. FilmTec Corp.,* 644 N.W.2d 801, 804 (Minn.2002). Whether the employee committed a particular act is a factual question, but whether the act constitutes employment misconduct is a question of law. *Scheunemann v. Radisson S. Hotel,* 562 N.W.2d 32, 33 (Minn.App.1997). This court will affirm a ULJ's determination unless the decision derives from unlawful procedure, relies on an error of law, or is unsupported by substantial evidence. Minn.Stat. § 268.105, subd. 7(d)(3)-(5) (Supp.2005).

## I

■■■ Wichmann asserts that "there is no evidence that the ULJ considered his responsibilities in conducting a fair hearing." We find that this challenge to the fundamental integrity of the ULJ and the judicial process has no basis in the record before the court.

A hearing to determine qualification for unemployment benefits is an evidence-gathering inquiry rather than an adversarial proceeding. Minn.Stat. § 268.105, subd. 1(b) (Supp.2005). The ULJ must ensure that all relevant facts are developed. *Id.* When a party is not represented by counsel, the ULJ should assist the party with presenting evidence. Minn. R. 3310.2921 (2005). Wichmann offers three examples as evidence of unfairness. None supports his contention.

Wichmann complains about the ULJ's failure to ask Wichmann about incidents in May and June 2005, his failure to ask for additional information or an explanation about November 7 and November 18, and his failure to ask Wichmann about how he gave his claimed notice to Urseth. But Wichmann acknowledges that the ULJ did not base the misconduct determination on the May and June 2005 incidents, in which Wichmann allegedly damaged a horse trailer and missed work while incarcerated on an arrest warrant. Not only did the ULJ appropriately choose not to explore those incidents, he asked Wichmann about each date he was allegedly late or absent. When discussing Wichmann's absences the week of November 21, Wichmann testified that he was ill "and [Urseth] knew that." The ULJ sought more support, asking, "Are you saying you called her on those mornings," and Wichmann interrupted to respond, "Yes, sir, she knew it." The ULJ also gave Wichmann ample opportunity to provide any additional testimony, asking him, "So what else would you care to tell me that you haven't covered in your written statements here to the [d]epartment or in your testimony today?" and "What else would you care to add?" Wichmann declined to cross-examine Urseth, who was not represented by counsel either, and Wichmann also declined to give a final statement to the ULJ. The record demonstrates that the ULJ conducted a fair hearing and assisted Wichmann appropriately.

## II

■■■ Wichmann asserts that the ULJ applied the wrong standard when evaluat-

ing his illness-related absences. The record does not support Wichmann's assertion.

When an employee is absent from work because of illness and gives the employer proper notice, the absence is not employment misconduct. Minn.Stat. § 268.095, subd. 6(a). An employer has the right to establish and enforce reasonable rules governing absences from work. *Jones v. Rosemount, Inc.*, 361 N.W.2d 118, 120 (Minn.App.1985). Refusing to abide by an employer's reasonable policies generally constitutes disqualifying employment misconduct. *Schmidgall*, 644 N.W.2d at 804.

Urseth testified that if an employee is unable to report to work, the employee must call her or another employee to make arrangements for shift coverage. She testified that "[i]f he was ill, it would have taken a phone call to myself or to [another employee] or to someone. We have ... a number of people that help out at the barn in emergencies.... And I would have found a replacement had I had a call that he wasn't coming in." The ULJ found that, on November 21, Wichmann was ill and returned home after feeding the horses but "did not arrange for anyone else to cover the rest of his shift." Focusing on November 22 and 23, the ULJ found that "[a]lthough Wichmann may have been ill these days, it was his responsibility to see that another employee took care of these duties and he had not done so." The ULJ explained his decision that the club discharged Wichmann for employment misconduct, stating, "Over the last few weeks of Wichmann's employment he was not reporting for work on time and not performing the duties that were required of him. Additionally, Wichmann was not arranging for anyone else to care for the horses and it was his responsibility to do so."

Wichmann argues that the ULJ erroneously put the burden on Wichmann to find a replacement worker rather than only to give notice of his absence. But the ULJ's underlying finding is that, even if Wichmann was actually ill, he gave no notice of his absence; the ULJ did not find, as Wichmann's argument would require, that Wichmann gave notice but failed to take the additional step of securing a replacement. Urseth testified that Wichmann could have given notice of his absence to just about anyone at the club so a replacement could be secured. The ULJ found that he did not. Although Wichmann could have also satisfied the policy requirement by arranging for a replacement on his own, he was not required to. The ULJ found that Wichmann failed in his responsibility to give any notice and follow his employer's reasonable policy.

### III

The ULJ did not make any express findings on the witnesses' credibility. Wichmann urges that this failure requires remand. Applying the plain language of the controlling statute, we agree.

In 2005, the legislature amended the procedure governing challenges to the department's determinations on unemployment benefits. 2005 Minn. Laws ch. 112, art. 2, § 34, at 70410. Before the legislature implemented these changes, a discharged employee or the department could seek review of the ULJ's determination by a senior unemployment review judge. Minn.Stat. § 268.105, subd. 2 (2004). If a party was still dissatisfied, the party could seek review by this court. *Id.*, subd. 7 (2004). Under these provisions the SURJ could make his own credibility determinations, and this court deferred to those determinations. *Ywswf v. Teleplan Wireless Servs.*, 726 N.W.2d 525, 530–31 (Minn. App.2007) (discussing recent history of

procedure governing review of unemployment-benefits determinations). The 2005 changes eliminated the SURJ position, and a party must now request reconsideration by the ULJ before seeking review in this court. Minn.Stat. § 268.105, subd. 2(a), (e) (Supp.2005). As part of these changes, the legislature added a requirement addressing witness credibility, providing that "[w]hen the credibility of an involved party or witness testifying in an evidentiary hearing has a significant effect on the outcome of a decision, the unemployment law judge must set out the reason for crediting or discrediting that testimony." *Id.*, subd. 1(c).

This court has recently held that it will uphold a ULJ's credibility determinations if supported by substantial evidence. *Ywswf*, 726 N.W.2d at 533. In *Ywswf*, however, we emphasized that the ULJ also made a basic finding that she did not find specific testimony by the relator credible. *Id.* at 532. The ULJ made no similar findings here, never addressing credibility. But credibility was central to the decision because the ULJ's misconduct determination rests on incidents that Wichmann disputes. Despite Wichmann's testimony that he gave Urseth notice of his absences for November 21 to 23, that he was not late for work on November 7, and that he did not alter his timecard, the ULJ found otherwise. Because credibility determinations significantly affected the outcome of the case, section 268.105, subdivision 1(c) required the ULJ to make credibility findings and to "set out the reason for crediting or discrediting" the contested testimony.

■ We recognize that this court usually can infer from findings which witnesses the ULJ found credible. But we cannot search for substantial evidence to support these inferences in the absence of specific findings. To do so would negate the ex-press requirement of section 268.105, subdivision 1(c). Because the ULJ did not make findings addressing credibility and the ULJ's finding of employment misconduct relies on a credibility assessment, we remand for additional findings that satisfy the statute.

■ On remand, the ULJ is free to make his determinations without reopening the record. But the ULJ may, within the ULJ's discretion, choose to reopen the record and hear additional testimony. When assessing witness credibility, the ULJ may consider all relevant factors, including, but not limited to, the witness's interest in the case's outcome, the source of the witness's information, the witness's demeanor and experience, and the reasonableness of the witness's testimony. *See Ywswf*, 726 N.W.2d at 532–33 (suggesting credibility considerations). If the ULJ chooses to reopen the record, he may also consider the various additional bases that the club presented as alternative reasons for discharging Wichmann.

## DECISION

We find that the unemployment law judge conducted a fair hearing and applied the correct standard when evaluating Wichmann's illness-related absences. But because the unemployment law judge did not make the credibility findings required by Minn.Stat. § 268.105, subd. 1(c) (Supp. 2005), we remand for additional findings.

**Remanded.**