*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0162**

Crystal Sayen,
Relator,

vs.

North Hennepin Community College,
Respondent,

Department of Employment
and Economic Development,
Respondent

**Filed November 2, 2015
Affirmed
Johnson, Judge**

Department of Employment and Economic Development
File No. 32827426-3

Crystal Sayen, Monticello, Minnesota (pro se relator)

North Hennepin Community College, Brooklyn Park, Minnesota (respondent)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent DEED)

Considered and decided by Kirk, Presiding Judge; Johnson, Judge; and Bjorkman, Judge.

UNPUBLISHED OPINION

**JOHNSON**, Judge

Crystal Sayen quit her job at North Hennepin Community College three days after her supervisor, with whom she had a difficult working relationship, began an indefinite leave of absence. An unemployment law judge determined that Sayen is ineligible for unemployment benefits because she did not quit her job for a good reason caused by her employer. On appeal, Sayen challenges that conclusion and other aspects of the ULJ's decision. We affirm.

## FACTS

Crystal Sayen worked as a customer-service specialist and student-life assistant at North Hennepin Community College (NHCC) from January 2006 until August 2014. For the last 14 months of her employment, her supervisor was B. David Galt. The general thrust of Sayen's appeal is that Galt treated her in an unfair and hostile manner between November 2013 and August 2014. Sayen has presented evidence of numerous examples, which we briefly summarize below.

On November 6, 2013, the day that Sayen returned to work after a maternity leave, Galt incorrectly informed her that her job would be eliminated by June 2014. On the same day, Galt imposed a lunch and break schedule on Sayen, who previously was not subject to such a schedule. Also on her first day back from leave, Galt relocated Sayen's workspace. He relocated her workspace three more times in the next nine months, in ways that she considered undesirable. In January 2014, Galt denied several of Sayen's requests for time off or failed to respond to her requests in a timely manner, which Sayen

perceived to be different from the treatment he gave to other employees. In January 2014, Galt also confronted Sayen with allegations of misconduct and rescheduled a meeting with her to discuss the matter four times before the allegations were dismissed. In February 2014, Galt gave Sayen a negative performance evaluation, which Sayen believes was due to her maternity leave. In May 2014, Galt offered overtime opportunities to another employee rather than to Sayen. In June 2014, Galt declined to approve a mileage reimbursement request submitted by Sayen. On several occasions, including a particular incident in July 2014, Galt yelled at Sayen.

Of special significance to this appeal is that, on July 10, 2014, Galt revised Sayen's work schedule, which had been 8:00 a.m. to 4:30 p.m., Monday through Friday, so that she started and ended her workday two hours later on every day except Friday. Sayen complained to her union representatives about the schedule change, but the union informed her that the change was permissible under the collective-bargaining agreement. On July 26, 2014, Sayen complained about the schedule change to NHCC's chief human-resources officer, who did not respond.

On August 1, 2014, Sayen was informed that Galt would be taking an indefinite leave of absence, beginning August 4, 2014. On August 5, 2014, Sayen gave NHCC two-weeks' notice of her intention to quit. Sayen's last day of work was August 19, 2014.

Sayen applied for unemployment benefits. The department of employment and economic development (DEED) issued an initial determination that Sayen is eligible for benefits. In September 2014, NHCC filed an administrative appeal. In early October

2014, a ULJ conducted an evidentiary hearing. After Sayen's testimony, the ULJ offered to continue the hearing, and both parties agreed that it should be continued. The hearing was completed in late October 2014. Sayen testified but did not call any other witnesses. Four witnesses testified on behalf of NHCC: the chief human-resources officer, a payroll specialist, a human-resources specialist, and a library technician who was also a union steward.

In November 2014, the ULJ issued a written decision in which she concluded that Sayen is ineligible for unemployment benefits. The ULJ noted that Sayen's "contention that she quit due to Galt's language, actions and conduct is not logical or believable, where Sayen waited until after Galt left on an indefinite leave to quit." After Sayen requested reconsideration, the ULJ affirmed her earlier decision, stating that Sayen "failed to show that evidence which was not submitted at the evidentiary hearing would likely change the outcome of the decision." Sayen appeals.

## D E C I S I O N

Sayen argues that the ULJ erred by determining that she is ineligible for unemployment benefits.

This court reviews a ULJ's decision denying benefits to determine whether the findings, inferences, conclusions, or decision are affected by an error of law or are "unsupported by substantial evidence in view of the entire record." Minn. Stat. § 268.105, subd. 7(d)(5) (2014). The evidentiary hearing is an evidence-gathering inquiry and is conducted without regard to any particular burden of proof. *See* Minn. Stat. § 268.069, subd. 2 (2014); *Vargas v. Northwest Area Found.*, 673 N.W.2d 200, 205

4

(Minn. App. 2004), *review denied* (Minn. Mar. 30, 2004). We review a ULJ's factual findings in the light most favorable to the ULJ's decision. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). If the relevant facts are undisputed, we apply a *de novo* standard of review to the question whether an applicant is eligible for benefits. *Grunow v. Walser Auto. Grp. LLC*, 779 N.W.2d 577, 579 (Minn. App. 2010).

## I. Exception to Quit Rule

As a general rule, an applicant who quits employment is ineligible for unemployment benefits. Minn. Stat. § 268.095, subd. 1 (2014). "A quit from employment occurs when the decision to end the employment was, at the time the employment ended, the employee's." *Id.*, subd. 2(a). The general rule is, however, subject to a limited number of exceptions. *See id.*, subd. 1(1)-(10).

During administrative proceedings in this matter, the primary issue in dispute was whether Sayen could satisfy the exception that applies if an employee quits for a good reason caused by the employer. *See id.*, subd. 1(1). Sayen reiterates that argument on appeal to this court. She also argues that she can satisfy another exception that applies if an employee quit because of a loss of childcare. *See id.*, subd. 1(8).

### A. Good Reason Caused by Employer

An applicant may be eligible for unemployment benefits despite quitting her employment if she quit for a good reason caused by the employer. *Id.*, subd. 1(1). This exception applies only if the employee quit for a reason "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become

5

unemployed rather than remaining in the employment." *Id.*, subd. 3(a). These three requirements "must be applied to the specific facts of each case." *Id.*, subd. 3(b). In addition, an employee seeking to invoke this exception "must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions." *Id.*, subd. 3(c).

Sayen attempted to persuade the ULJ that she quit for a good reason caused by her employer. As described above, she presented evidence that her supervisor, Galt, treated her in an unfair and hostile manner. The ULJ rejected her argument. The ULJ found that Galt did not intend to discriminate against Sayen and that Sayen was not subjected to treatment that would cause an average employee to quit and become unemployed. The ULJ found that Sayen's decision to quit was not logically based on Galt's alleged mistreatment because she quit shortly after she learned that Galt had taken an indefinite leave of absence.

The ULJ properly reasoned that Sayen's asserted reasons for quitting were not so intolerable that they would "compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *See id.*, subd. 3(a). The conduct described by Sayen is much less severe than the conduct that typically satisfies this exception, such as threats of physical violence and repeated verbal harassment. *See, e.g.*, *Nichols v. Reliant Eng'g & Mfg., Inc.*, 720 N.W.2d 590, 592-93 (Minn. App. 2006). This case is more similar to those cases in which we have concluded that the exception was not satisfied. *See, e.g.*, *Portz v. Pipestone Skelgas*, 397 N.W.2d 12, 14 (Minn. App. 1986) (holding that "[u]nsatisfactory working conditions and a poor relationship with a

6

supervisor" did not constitute good cause to quit).  More specifically, the changes to Sayen's work hours, which the ULJ found were the primary motivation for her decision to quit, are insufficient to satisfy the exception.  A significant reduction in hours or wages may constitute a good reason to quit.  *Haugen v. Superior Dev., Inc.*, 819 N.W.2d 715, 723 (Minn. App. 2012).  But an unfavorable or inconvenient change in an employee's work schedule, without a reduction in hours, does not satisfy the exception.  *See Markert v. National Car Rental*, 349 N.W.2d 859, 861 (Minn. App. 1984).

Furthermore, the ULJ properly reasoned that Sayen cannot prevail in light of the fact that she quit after Galt took a leave of absence.  Even if she were unsure of the duration of his leave, as she claims, she at least could have extended her employment during his leave without experiencing his adverse treatment, and she could have refrained from quitting until he actually returned to work.  The ULJ did not err by considering the relative timing of Sayen's decision to quit and Galt's leave of absence.

Thus, the ULJ did not err by determining that Sayen does not satisfy the exception for a good reason to quit caused by the employer.

**B.    Loss of Child Care**

An applicant also may be eligible for unemployment benefits despite quitting her employment if "the applicant's loss of child care for the applicant's minor child caused the applicant to quit the employment, provided the applicant made reasonable effort to obtain other child care and requested time off or other accommodation from the employer and no reasonable accommodation is available."  Minn. Stat. § 268.095, subd. 1(8). Sayen did not argue to the ULJ that she satisfies this exception to the quit rule, and the

7

ULJ did not address the issue in her written decisions. Sayen makes the argument for the first time on appeal to this court. The department has responded to the argument. Accordingly, we will consider the issue, even though the ULJ did not make any relevant findings or conduct any analysis of the issue.

The evidence in the record is insufficient to allow Sayen to satisfy this exception to the quit rule. Sayen did not introduce any evidence that she actually experienced a loss of child care. She testified that her mother-in-law provided child care and that her husband normally dropped off their children at 6:00 a.m. and picked them up at 4:00 p.m. Accordingly, it appears that Sayen's work hours did not have a direct effect on the availability of child care for her children. It is understandable that the proposed change in her work schedule would be less desirable because it would prevent her from spending as much time with her family on four evenings each week. But Sayen does not assert that she actually lost child care or that a loss of child care was imminent. Sayen also admitted that she had not requested time off or any other accommodation related to child care before she quit, which is a prerequisite for this exception to the quit rule. *See id.*

Thus, Sayen cannot satisfy the exception to the quit rule based on loss of child care.

## II.  Fairness of Hearing

Sayen also argues that the ULJ failed to conduct a fair evidentiary hearing. A ULJ should conduct an evidentiary hearing as an "evidence-gathering inquiry, without regard to a burden of proof" and "must ensure that all relevant facts are clearly and fully developed." Minn. R. 3310.2921 (Supp. 2014); *see also Wichmann v. Travalia & U.S.*

*Directives, Inc.*, 729 N.W.2d 23, 27 (Minn. App. 2007); *Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529 (Minn. App. 2007). The ULJ "must exercise control over the hearing procedure in a manner that protects the parties' rights to a fair hearing." Minn. R. 3310.2921. A hearing generally is considered fair and even-handed if both parties are afforded an opportunity to give statements, cross-examine witnesses, and offer and object to evidence. *See Wichmann*, 729 N.W.2d at 27; *Ywswf*, 726 N.W.2d at 529-30.

Sayen contends that the ULJ did not provide her a fair hearing for several reasons. First, Sayen asserts that the ULJ failed to question NHCC's witnesses about certain issues. The issues that Sayen claims should have been further explored, however, are of marginal relevance. Second, Sayen asserts that the record was not fully developed because the ULJ made erroneous factual findings. The findings that Sayen claims are erroneous concern issues on which the evidence was disputed and on which the ULJ found NHCC's witnesses more credible. Third, Sayen asserts that the ULJ did not inform her of the opportunity to use a subpoena to obtain testimony from non-parties. But the ULJ actually did inform the parties at the outset of the hearing of the opportunity to obtain additional evidence by serving subpoenas on witnesses.

In general, it appears that the ULJ conducted a fair hearing. The ULJ was thorough and was particularly attentive to Sayen's status as an unrepresented party. The ULJ asked a series of detailed questions about Sayen's childcare situation and about the situations of other NHCC employees with children. The ULJ took the rather unusual step

9

of continuing the hearing for a second day, which indicates that Sayen was given more of an opportunity to present evidence than is the norm.

Thus, the ULJ did not fail to conduct a fair evidentiary hearing.

**Affirmed.**